OPINION OF THE COURT
David M. Brockway, J.
This court is called upon to once again ultimately determine whether it is in the best interest of a morbidly obese child, who also suffers from numerous comorbidities, to be removed from parents who have consistently failed to address her severe medical concerns and who have also failed to ensure her proper school attendance. No reported case law exists in New York on this issue. For the reasons set forth below, the court decides that removal is appropriate and necessary.
An (amended) petition was filed March 23, 2006 by the Chemung County Department of Social Services.[1] The department seeks to have the court find the respondents, Shawna T. and Robert T. (hereinafter the respondents) in willful violation of this court’s order of disposition dated August 4, 2003, which was subsequently extended on June 24, 2004, February 14, 2005 and February 7, 2006 (the latter for a period of one year, which is currently pending extension). The petition also seeks placement of the child with the department.
By way of history, the court’s records reflect that the initial 90-day progress report[2] included several serious concerns about the respondents’ lack of progress. The court therefore returned the matter for review on November 24, 2003. At that appearance, the respondents consented to the immediate placement of the child, Brittany T. (date of birth 1994) with the department through a kinship foster care placement with a maternal aunt. The court granted the placement due to serious and continuing health concerns related to the child’s morbid obesity and the parents’ lack of consistency and commitment in addressing both her medical and physical needs as well as school attendance issues. On April 19, 2004, the child was returned to the parents but reentered foster care by order of this court dated October *608 19, 2004. On October 21, 2004 the department filed a violation petition against the respondents. The violation petition resulted in a six-month adjournment in contemplation of dismissal (ACD) being granted on February 14, 2005. Conditions of the ACD included the parties consenting to the child remaining in (kinship) foster care and a requirement that they continue to follow the original terms and conditions. The child was returned to the parents’ care and custody on or about September 5, 2005. From the credible court records and evidence, it can be concluded that during these periods, the child’s weight underwent significant changes, which can be summarized as follows:
Appx Date(s) Residence Appx Age Appx Weight
Oct 2002 Parents 8.8 237
Nov 2003 Consent Removal 9.9 261
April 2004 Returned to Parents 10.2 252
Oct 2004 Removal 10.8 255
Nov 2004 Started @ Geisinger 10.9 256
Sept 2005 Returned to Parents 11.7 238
Mar 2006 Instant Violation 12.1 263
May 2006 With Parents 12.3 266
Department’s Case
The instant petition alleges that the respondents have again willfully and without just cause violated terms and provisions of the court’s dispositional order by, inter alia, failing to ensure that the child attend school on a regular basis and on time, failing to take the child at least two to three times per week to the gym, failing to actively and honestly attend and participate in a nutrition and education program, failing to cooperate with the referred programs, and failing to sign necessary releases of information. Specifically, it is alleged that the respondents violated terms 18, 21, 22 (incorrectly referred to as number 24 in the petition), 23, 26 and 27. Several days of fact-finding occurred over a period of many months.
Terms 18 and 21
Term 18 requires the respondents to “sign all releases of information for themselves and the child requested by the Department in order that the Department may monitor the Respondent’s [sic] progress and attendance in all programs to which they are referred.” Term 21 requires the respondents to “cooperate with the Department of Social Services and all programs to which they are referred.”
*609 Karen Carlyle, a senior caseworker for the department, credibly testified that she was assigned to respondents’ case in October of 2005 and has since encountered much resistance and numerous difficulties with the respondents. She has been cursed at, threatened with arrest and harangued over the telephone by both of the respondents. Ms. Carlyle also testified that the respondents have refused to sign releases of information when requested by her.
Term 22 and 27
Term 22 provides that the respondents “shall use all resources available to ensure the mental, physical and emotional well-being of the child”; term 27 requires that the parents “buy a membership in a local gym and take the child to this gym at least two to three times a week.”
Mark Monichetti, director of Elmira Fitness Center, testified regarding Brittany’s enrollment at the center and her attendance thereat. Records of attendance are made through an identity card with a bar code on it. Based upon logs for the period August 12, 2005 through February 27, 2006 and created through the use of the child’s card, the credible evidence establishes that Brittany did not attend the gym two to three times per week. Nor were any valid explanations for said failure adduced at hearing.
Term 23
Term 23 requires the respondents to
“take all actions necessary to ensure that the children [sic], if of appropriate age, attend school regularly and complete all homework assignments. The respondents shall communicate and cooperate with the children’s [sic] school to ensure the children [sic] are in an appropriate classroom setting. The Respondent shall account for all absences or tardies with a note personally provided by the Respondents to the appropriate school official. Absences of three or more days in succession shall be accounted for by a note from a health care provider personally provided by the Respondent to the appropriate school official.”
With respect to this requirement, the department presented the testimony of Rose Kramarik, principal of Broadway Middle School. Ms. Kramarik testified that from the commencement of the 2005-2006 school year through March 23, 2006, the child was absent 18 days and was tardy on 25 days out of a possible *610 68 days. Ms. Kramarik testified that in order for an absence to be considered “excused” the parent simply needs to supply the school with a note explaining the reason for the child’s absence. Seventeen absent days were “excused” and one day of absence was “unexcused.” The child was illegally tardy (late coming to school) 25 times from, the beginning of the school year until March 23, 2006, when the instant petition was filed. In summary, she said the child was either absent or tardy 48 out of 68 school days. The department also introduced the child’s attendance logs documenting the aforesaid absences and tardies. Term 26
This term requires the respondents to
“actively and honestly attend and participate in a nutrition program education program [sic] approved by the Department. They shall actively and honestly follow any and all recommendations, attend all meetings until successfully discharged and fully comply with any recommended after care and/or discharge plans. The respondents shall utilize the skills and techniques taught in said program during contact with the child.”
Bruce Brennan, a registered dietician employed by the Nutrition Clinic in Elmira, New York, testified that Shawna and Brittany T. first became involved with the clinic in August 2005 and with him personally in January 2006. His first appointment with them was scheduled for January 12, 2006. Respondent Shawna T. did attend the first session and thereafter cancelled the following three appointments. Brennan testified that one appointment was cancelled due to weather and one appointment was cancelled due to Mrs. T. ostensibly being treated at the emergency room. No explanation was offered for the third cancelled appointment. Ms. Carlyle during her testimony on this point had also expressed concern over Brittany’s weight increasing from 238 pounds to 263 pounds during the relatively short period of time from October 2005 until April 2006, despite involvement with the nutrition clinic.
Also generally testifying on behalf of the department, and probably most compelling, was Dr. William J. Cochran. Cochran is a board certified pediatric gastroenterologist and nutritionist. He is currently the director of the pediatric weight management program and vice-chairman of the department of pediatrics at Geisinger Health Systems (Danville, Pa). Cochran was formerly on the faculty of the Baylor College of Medicine (Houston, Tex) *611 and has lectured and written extensively (including a book) on pediatric obesity.
Cochran had first started working with the child and respondents by doing an evaluation in November 2004. Extensive testing, interviewing and teaching has been done with Brittany, and he has been monitoring her weight management program. Genetic and psychiatric disease syndromes were ruled out by Cochran; rather, he deemed the obesity as simply due to excessive caloric intake and a sedentary lifestyle.
Cochran credibly testified that the child currently suffers from morbid obesity and associated comorbidities. One is considered morbidly obese in medical literature and by practitioners when one’s body mass index (BMI) exceeds 40. An ideal BMI is 18 — 25; Brittany’s BMI is 50. Comorbidities are other disorders or diseases accompanying a primary diagnosis. In Brittany, these include those typically found with morbid obesity: gallstones, excessive fat in her liver with resultant fatty liver disease (which, he said, could eventually develop into nonalcoholic cirrhosis of the liver), sleep apnea, intermittent high blood pressure, pain in her knee joints, insulin resistence (indicating an increased risk of developing diabetes) and acanthosis nigricans (darkening and thickening of the skin around her neck associated with insulin resistance). Additionally, he testified as to the significant social and psychological impact such morbidity has. This is accentuated for females. According to the doctor, Brittany had, indeed, recently been exhibiting signs of depression.[3]
The program in which Brittany has participated through Cochran is a multidisciplinary one. It consists of 15 sessions, and involves behavior modification, lifestyle changes, dietary assistance, and exercise therapy. Cochran expressed his concern that after two and a half years, the attempts to deal with Brittany and the parents regarding her obesity have, overall, been “unsuccessful.” Very much concerning to Cochran was that in the fall of 2005 (when the child left his program and was returned to the respondents), she weighed 238; by February of 2006 (when she was ordered to reenter it), she weighed in at 261, a gain of approximately five pounds per month. This all occurred while a weight loss of one to two pounds per month had been achieved and was a realistic expectation for the future. *612 She returned, to the program having gained “twenty (20) some odd pounds more than when she left,” the “exact opposite of where she should be.” Cochran opined that in his expert opinion, if the child does not receive the necessary and proper attention for her morbid obesity she would be expected to have continued weight increase and her health would deteriorate further and that these medical concerns were “life-limiting.” Moreover, her risks are exacerbated by the family history of hypertension, heart disease, stroke and diabetes.
Cochran, who testified April 7, 2006, had a personal discussion with Brittany and the mother regarding caloric intake, proper foods, and the need for vigorous exercise[4] and lifestyle changes. He testified that it is important that the parents be role models regarding lifestyle and weight reduction habits. Typical of his concerns was an incident he described in November of 2004. He testified that he had just spent a long session with Brittany and Mrs. T. regarding Brittany’s health, including appropriate eating and foods, regarding which the mother said she understood. Right after the appointment, he went to an eating establishment across from the hospital. There, he saw Brittany eating french fries and a “hamburger or something of that nature.” This, he said, “would not have been the type of foods I would have hoped her to be consuming after sitting down and just talking about the problem.” More recently, he noted, food logs continue to reflect regular ingestion by the child of foods he would certainly not recommend, including “lots of chicken nuggets, lots of pop tarts, hot dogs and pizza.”
The Respondents’ Case
Dr. Kenneth Sobel, a pediatrician employed by Southern Tier Pediatrics has been the child’s pediatrician since May 2006, after taking over for another pediatrician in his office. Sobel testified that he has seen Brittany approximately three or four times since becoming Brittany’s primary pediatrician. He testified credibly that he has recently seen improvement in the child’s latest blood cholesterol tests, which show a reduction in the child’s lipid levels. Brittany’s apnea issues also seem to be stabilized at this point. Nevertheless, he added that he is greatly concerned about the child’s morbid obesity and believed that weight loss was a realistic expectation. He concluded that Brittany is “one young lady who has got some significant medical *613 issues and who will have more over time if things do not improve” (transcript, June 23, 2006, at 160).
Testifying on behalf of Sh,awna T. was Nancy Coldiron, who testified June 23, 2006. She is a school counselor at Broadway Middle School. Coldiron testified that she has been Brittany’s counselor since September 2005. She described Brittany as a bright young lady who is currently maintaining a passing academic average. She also testified that she has been working with the respondents on Brittany’s tardiness and attendance problems. Coldiron stated that she has seen some progress in Brittany’s grades and attendance. The court notes this has only been since February 2006.
Testifying on behalf of respondent Robert T. was Carolyn Hodges, director of the Sol Stone Center for Eating Disorders in Elmira and also a director of the nutrition clinic. Hodges is a clinical dietician with a Master’s from Marywood College. She testified that she is familiar with Brittany’s participation in the program and had seen some improvement in Brittany over time.[5] Hodges testified that it is essential for the parents to actively participate with the child in the nutrition program in order for the program to be effective. Hodges explained that Brittany suffers from a significant amount of emotional distress related to her excessive weight and concurred with the other experts’ testimony that Brittany’s excessive weight has a detrimental effect on her physical and emotional well-being. During the period she has worked with the family, she felt that Brittany was making progress. She opined that she knew of no children removed from their homes due to weight and that she felt that being with any parent was better than being with no parent at all.
The respondents testified on their own behalf. Court records indicate the father (date of birth 1966) is now approaching 41 years of age. He is confined to a wheelchair and, he testified, suffers from cardiomyopathy, muscular dystrophy, arthritis and scoliosis. He asserted that “all” the family follow a dietary regime. He further testified that Brittany bowls weekly, has attended school dances and has walked to school once. Much of Brittany’s tardiness, he said, was because he thought school started at 8:15, not 8:00. He also proffered that Dr. Sobel had told the parents that Brittany’s average physical “health has been fine.”
*614 The mother, according to court records, is soon to be 32 years of age (date of birth 1972). The court has observed throughout the past four years that Mrs. T. herself is very obese (the April 6, 2006 DSS 30-day report to the court indicated that her weight at the nutrition clinic on April 5, 2006 was 436 pounds). Moreover, at least fairly recently, the court has observed that the mother suffers from some very audible breathing difficulties. The mother expressed during testimony (as she had to Dr. Cochran several years earlier) a seeming understanding of caloric intake, the keeping of accurate food logs, the importance of exercise and the like. She offered that there were numerous difficulties during the period of supervision including such things as weather and transportation troubles and a hospital stay for herself for gallstones. She was aware that Brittany often had snacks after school and after dinner in the evening and that the child was known to “sneak food” at home. She also attributed some of the compliance difficulties to Brittany getting “frustrated” at “all she needs to do” and that the child “hates all of what the court has ordered the parents to do.” On a positive note, the mother indicated that Brittany was now enjoying and doing better in school, to which she or her husband regularly drive her the half mile.
Distilled to its essence, the parents disagreed with particular dates and times, but did not refute that there have been missed appointments, missed school days and numerous tardies. While not disputing that they have not thoroughly complied with the court’s dispositional order, they indicated they had tried their best. Essentially, however, they each offered numerous excuses for their noncompliance and argued that the child has not been negatively impacted by their noncompliance. The court frankly finds the respondents’ explanations regarding their inability to comply with the terms to be spurious, unpersuasive and largely lacking credibility.
Law on Violation
A petition alleging a violation of an order of supervision can be sustained if the court is satisfied by competent proof that the violation was done “willfully and without just cause.” (Family Ct Act § 1072.) Not statutorily specified, however, is the level of proof needed. Family Court Judge Marilyn O’Connor in Matter of L.M. (12 Misc 3d 1198[A], 2006 NY Slip Op 51619[U] [Fam Ct, Monroe County 2006]) discusses this statutory void. As she notes, “[t]he degree of proof required in a particular type of *615 proceeding ‘is the kind of question which has traditionally been left to the judiciary to resolve.’ Woodby v INS, 385 US 276, 284 [1966].” (2006 NY Slip Op 51619[U] at *3.) She points out that the Third Department (see Matter of Elizabeth T, 299 AD2d 748 [3d Dept 2002]) has “applied the ‘clear and convincing’ evidence standard to a violation issue without discussing why that standard was used or citing authority for its use.” (Id. at *3.) She also notes that in another matter (rising oiit of this court), the Third Department seems to conclude that “ample evidence” of such a violation might be all that is required (id.). (See Matter of Linda FF, 301 AD2d 887, 889 [3d Dept 2003].) Judge O’Connor concludes (properly, in this court’s opinion) that “[s]ince a respondent faces the potential of a jail term and loss of freedom for a violation of an order of supervision” a “clear and convincing evidence” standard must be met in order to establish a willful violation of an order of supervision under Family Court Act § 1072 (id.).
Additionally, it is well established that terms to be enforced must sufficiently apprise a respondent what is required of him, her or them. Here, the terms are very clear. Moreover, it is equally clear that a willful violation is supported by one’s failure to regularly attend and meaningfully participate in programs, as it indicates an unwillingness or inability to take the steps necessary to assume responsibility for one’s children. (Matter of Marquise EE., 257 AD2d 699 [3d Dept 1999].)
Discussion and Conclusions as to Violation
With respect to the alleged violation of term 26, the court finds that several of the missed appointments at the nutrition clinic may have been with just cause and thus so much of the violation of term 26 as is based thereon, is not sustained. With respect to the rest of term 26 and all of the other terms, however, their willful violation is sustained by competent, credible evidence which is ample, clear and convincing. The respondents’ failures regarding those established to have been violated are further found, by equally clear and convincing evidence, to have been without just cause. All of this has convincingly and patently had a very negative physical, emotional and mental impact on Brittany. (Nicholson v Scoppetta, 3 NY3d 357 [2004].)
In arriving at these conclusions, it is startling to read the original neglect petition of February 21, 2003 (when Brittany was about to turn nine). That petition alleged, inter alia, that
*616 “Brittany T. has a severe weight problem and weighs in excess of 240 pounds. Brittany has been seen by a variety of doctors and all of the physicians involved are very concerned about her health due to the fact that she is morbidly obese. Despite these doctors’ concerns, Mr. and Mrs T. have been uncooperative with service providers and have shown a lack of follow through with these services. [Physicians] have made numerous recommendations to Mr. and Mrs. T. in the past and none of these recommendations were ever followed through with. ... It has been determined by [the physicians] involved that Brittany’s weight problems are not organic in nature and are the result of poor parental modeling and control of food intake. Physicians have seen a pattern of alarming behavior on the part of Mr. and Mrs. T. regarding their attitude toward Brittany’s morbid obesity and her extremely poor attendance in school. Brittany has had attendance problems at school ever since she began kindergarten. Many of these absences have been unexcused absences and the family refuses to ensure that Brittany atténd school, even [on] a semi regular basis. . . . When Robert and Shawna have enrolled Brittany in programs in the past, they have not continued with these programs and have multiple excuses as to why they do not continue. . . .”
Shockingly, it is truly as if nothing (except weight gain) has changed in the past three-plus years. This court on many, many occasions has expressed its concern with respect to the lack of commitment and motivation demonstrated by the respondents in effectively and wholeheartedly addressing their daughter’s school issues (at least until the eve of trial) and her morbid obesity. The latter concern continues unabated, along with its concomitant health complications. It is inconceivable to this court that the respondents continue to disregard the medical and other advice of their experts. This is despite the myriad services which the department has actively and repeatedly urged. Furthermore, CASA, too, has been intimately involved with and assisted the family since its assignment in October 2004. Even more incredible is that this has continued in spite of respondents’ knowing that their jailing and/or their daughter’s removal from home were more immediate likelihoods than Brittany’s probable premature death.
The long history of this unfortunate case demonstrates that the respondents have unequivocally evinced an unwillingness to *617 follow doctors’ and others’ advice, so as to justify a finding that they willfully violated the terms of the order of disposition. The respondents’ continued noncompliance in ensuring Brittany’s regular school attendance and in assuring their active and diligent cooperation with, and participation in, programs designed to aggressively address the child’s morbid obesity, only amplifies the willfulness of their violation. The court recognizes the physical limitations of the respondents but finds that this neither excuses nor prohibits them from executing their parental and court-ordered responsibilities.
Law on Disposition of Violation
Pursuant to Family Court Act § 1072, when the court is
“satisfied by competent proof that the parent . . . has violated the order of supervision willfully and without cause, the court may (a) revoke the order of supervision . . . and enter any order that might have been made at the time the order of supervision was made [pursuant to Family Ct Act § 1052], or (b) commit the parent . . . who willfully and without just cause violated the order to jail for a term not to exceed six months.”
Family Court Act § 1052 (a), in turn, authorizes the court to (i) suspend judgment pursuant to Family Court Act § 1053, (ii) release the child to the custody of the parent or other person legally responsible in accord with Family Court Act § 1054, (iii) place the child in accord with Family Court Act § 1055, (iv) make an order of protection in accord with Family Court Act § 1056, or (v) place the respondents under supervision in accord with Family Court Act § 1057. In making a dispositional order, the court’s order must reflect a resolution consistent with the best interests of the child after consideration of all the relevant facts and circumstances, and must be supported by a sound and substantial basis in the record. (Matter of Alaina E., 33 AD3d 1084, 1087 [3d Dept 2006].) In making a determination of placement, the court must consider not only the custodian’s ability to provide adequate shelter, but all the facts and circumstances relevant to the child’s best interests. (Matter of Harriet U. v Sullivan County Dept. of Social Servs., 224 AD2d 910, 911 [3d Dept 1996]; Matter of Megan G., 291 AD2d 636 [3d Dept 2002]; Matter of Belinda B., 114 AD2d 70 [4th Dept 1986].)
In regard to removal of a child due to morbid obesity and its related health concerns, the court has found no similar reported *618 cases in this state. In a very similar matter (involving a 461-pound 16 year old), the Court of Common Pleas of Northumberland County, Pennsylvania (Charles Saylor, J.) found that because of the parent’s limitations and the lack of attention in addressing the child’s medical appointments and schooling, it was clear that best interests required the continued placement of the child in foster care until such time as the parent could “demonstrate the ability to offer the required assistance and support to her son,” and until “new eating habits, education and exercise programs become more ingrained and of a habitual nature” (In re D.K., 58 Pa D & C 4th 353, 360 [Pa Ct CP 2002]).[6] Courts in several other states (California, Iowa, Indiana, New Mexico and Texas) have also recognized morbid obesity as an actionable issue. (See, Patel, Super-Sized, Kids: Using the Law to Combat Morbid Obesity in Children, 43 Pam Ct Rev 164 [2005].) The Iowa case appears to involve a child strikingly similar in age, height and weight to Brittany. Removal was ordered in that case as well. (In Interest of L.T., 494 NW2d 450 [Iowa Ct App 1992].)
Discussion and Conclusions as to Disposition
It is clear in New York that a child is neglected when his or her “physical, mental or emotional condition has been impaired ... as a result of the failure of his or her parent to exercise a minimum degree of care in supplying the child with adequate . . . education ... or medical. . . care, though financially able to do so.” (Family Ct Act § 1012 [f] [i] [A].) The respondents, due to their continued failures with respect to Brittany’s educational and medical needs, have not provided that minimum degree of care, which is measured against the behavior of reasonable and prudent parents faced with the same circumstances. (Matter of Alaina E., 33 AD3d 1084 [3d Dept 2006].)
This court is cognizant of potential concerns regarding the power of the State to drastically intervene in the regulation of family affairs with respect to morbid obesity. It is also very aware of the emotional impact that disruptions in the parent-child relationship may have. This court also agrees and holds that state intervention would generally “not be justified . . . simply because a child was overweight, or did not simply engage in a healthy and fit lifestyle.” (In re D.K. at 358.) However, where, as here, there are clear medical standards and convinc *619 ing evidence that there exist severe, life-limiting dangers due to parental lifestyle and persistent neglect, removal is justified. This is no less a cause for determining neglect and ordering removal than is a matter where a child is at risk of life-limiting consequences due to malnourishment, inadequate supervision or other heretofore well-established bases for removal. Indeed, “the obesity must be of a severe nature reaching the life threatening or morbid state, which has also manifested itself in physical problems, such as those present here, or mental problems.” (In re D.K. at 358.)
In so deciding, of course, the court notes that less drastic remedies should generally be attempted first. In the instant matter, as noted above, absolutely every thing and every effort has been attempted — not for months, but for years. The court finds that Brittany’s continued residency in the home is contrary to her health, welfare and safety and that the best interest of the child warrants her removal from the care and custody of the parents and placement once again with the department. The court finds that the department has employed not only reasonable but, indeed, extraordinary efforts to prevent or eliminate this need.
Therefore, it is hereby ordered that the respondents are found in willful violation of this court’s dispositional order dated April 24, 2003 (as subsequently extended by this court); and it is further ordered that the child Brittany T. shall, pursuant to section 1055 of the Family Court Act, be placed in the custody of the Commissioner of the Chemung County Department of Social Services within seven court days of the entry of this order; and it is further ordered that the parents shall be authorized to jointly visit the child at the Human Resources Building, or where the child might be placed, or other fitting place chosen by the department, twice per week, totaling no less than four hours per week, provided it is in keeping with the department’s service objectives and placement goals; and it is further ordered that the respondents, pursuant to Social Services Law § 409-e (3), shall be notified of any and all planning conferences, of their right to attend the conference(s), and of their right to have counsel or another representative or companion with them; and it is further ordered that the court specifically prohibits any trial discharge without court leave; and it is further ordered that, subject to future petitions or hearings, return to parents is the permanency goal, provided that the child obtains and maintains a healthy weight and lifestyle before returning home *620 and further provided that one or both parents can actually demonstrate an ability to provide appropriate home, school and community supports so as to so maintain the child, including indicia of consistently affording an environment conducive to healthy eating habits, exercise regimens and to meeting educational attendance requirements; and it is further ordered that the prior disposition is revoked, but the same terms and conditions of supervision are hereby reimposed on this violation, for a period of 12 months.

. The original child neglect petition was filed February 21, 2003.

. Dated November 5, 2003

. As discussed below, it also likely explains much of her school attendance deficiencies.

. Dr. Cochran remarked that the Centers for Disease Control recommend one hour of vigorous activity daily in such situations.

. The record is unclear as to what periods of time Ms. Hodges was actually directly involved in working with Brittany and Shawna T.

. Interestingly, Dr. Cochran appears to have rendered testimony in that case as well (see decretal paragraph 16 therein at 362).